UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN BURKE,<br><br>    Plaintiff,<br><br>  v.<br><br>PAUL J. WIEDEFELD, General Manager,<br>Washington Metropolitan Area Transit<br>Authority,<br><br>    Defendant. | Case No. 19-cv-3145 (JMC) |

**MEMORANDUM OPINION**

  Plaintiff John Burke brings this action against Defendant Paul J. Wiedefeld in his official capacity as General Manager and Chief Executive Officer of the Washington Metropolitan Area Transit Authority (WMATA) after Burke was arrested multiple times for panhandling at Metro stations in the District of Columbia.[1] ECF 23. Burke asks the Court to declare WMATA's permit scheme unconstitutional and to enjoin WMATA from enforcing the District of Columbia's panhandling statute against him. ECF 23 at 27–29; *see* D.C. Code § 22-2302(b). Defendant moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting that Burke lacks standing to challenge the permit scheme and has failed to state a claim with regard to his challenge of WMATA's enforcement of the panhandling statute. ECF 25.

  The Court finds that, because Plaintiff has alleged a well-founded fear of punishment under WMATA's Use Regulations for engaging in constitutionally protected activity, he has standing to

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

1

bring a pre-enforcement challenge to WMATA's permit scheme. The Court also finds that Plaintiff has stated a claim upon which relief can be granted. Plaintiff has pled sufficient facts to establish that his panhandling constitutes speech protected by the First Amendment and that police officers have, contrary to *McFarlin v. District of Columbia*, 681 A.2d 440 (D.C. 1996), acted beyond the scope of the law by punishing his panhandling outside the fifteen-foot radius surrounding the Metro escalators' entrance and exit. Therefore, the Court **DENIES** the motion to dismiss.

I.  BACKGROUND

Plaintiff is a roughly 30-year-old man who has panhandled at WMATA Metro stations since 2016. ECF 23 ¶¶ 2, 6. Over the years, Plaintiff has been arrested three times for panhandling at the L'Enfant Plaza and Smithsonian Metro stops. *Id.* ¶ 19. Each time, Metropolitan Transit Police Department (MTPD) officers stated they were arresting Plaintiff for panhandling in violation of D.C. Code § 22-2302(b) when he sat more than fifteen feet away from the escalator entrance and held a sign that read, "Grateful for anything." *Id.* ¶¶ 26–30, 51, 78–89. During each arrest, MTPD issued Plaintiff a citation with a monetary fine and forced him to leave the Metro station. *Id.* In addition to his own arrests, Plaintiff alleges that other panhandlers have similarly been arrested by the MTPD for panhandling in the "above ground" areas of other Metro stations. *Id.* ¶¶ 90–104.

Under D.C. law, "[n]o person may ask, beg, or solicit alms" at any "subway station or stop," D.C. Code § 22-2302(b), and the D.C. Court of Appeals has held that this ban on solicitation applies "within fifteen feet of a subway escalator" and is consistent with the First Amendment. *McFarlin*, 681 A.2d at 448–49. Supplementing the D.C. Code, WMATA has implemented its own "Use Regulations" designed "to ensure that WMATA property is used safely." WMATA, Regulations Concerning the Use of WMATA Property, Preamble (2018) (hereinafter, "Use

Regulations"). One regulation mirrors Section 22-2302(b) by prohibiting "Speech or Performance Activities" within fifteen feet of any "escalator, stairwell, fare gate, mezzanine gate, kiosk, or fare card machine." *Id.* § 4.1.1. Those who wish to participate in Speech and Performance Activities outside of this fifteen-foot radius may do so, but they must first obtain a permit. *Id.* § 2.1. Permits are issued on an activity-by-activity basis at the sole discretion of WMATA. *Id.* § 3.1. The Use Regulations do not explicitly prohibit panhandling, but "[c]onsistent with the D.C. panhandling statute," as understood by Defendant, "WMATA does not allow panhandling at Metro stations." ECF 25 at 14; *see also* Use Regulations § 3.1 (prohibiting permits for illegal activities).

After his arrests, Plaintiff filed this lawsuit under 42 U.S.C. § 1983, raising two challenges. First, Plaintiff claims that MTPD officers wrongfully arrested him beyond the so-called "*McFarlin* zone"—i.e., the fifteen-foot radius surrounding the escalators beyond which the panhandling statute allegedly does not apply—and thus unconstitutionally infringed on his speech protected by the First Amendment. ECF 23 ¶ 142. Second, Plaintiff claims that the permit scheme mandated by WMATA's Use Regulations is unconstitutional either as an unlawful prior restraint on speech or as a bare registration scheme with insufficient protection against viewpoint discrimination given, for example, WMATA's broad discretion to deny permits and therefore restrict speech. *Id.* ¶¶ 155–56, 164–65, 173–74. To remedy his arrest record and inability to panhandle due to fear of future legal consequences, Plaintiff asks the Court to declare WMATA's permit scheme unconstitutional and enjoin WMATA from enforcing Section 22-2302(b) outside of the *McFarlin* zones. ECF 23 at 28–29.

Defendant moves to dismiss Plaintiff's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF 25 at 1. First, Defendant argues that Plaintiff lacks standing under 12(b)(1) because he has failed to demonstrate that the permit scheme, rather than the statute, caused

his injuries. ECF 25 at 12–14. Second, Defendant argues that Plaintiff has failed to state a claim under 12(b)(6) because panhandling is not protected speech and WMATA properly applied Section 22-2302(b) to Burke's conduct. ECF 25 at 15–16.

## II.  LEGAL STANDARD

When facing a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a court must "treat the complaint's factual allegations as true" and afford the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000). Standing is an "irreducible constitutional minimum" required for subject matter jurisdiction derived from Article III's "case or controversy" requirement. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff has standing where they have suffered an "injury in fact," there is a "causal connection between the injury and the conduct complained of," and it is likely that the "injury will be redressed by a favorable decision." *Id.* at 560–61. An "injury in fact" is an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent." *Id.* at 560. The remaining two prongs known as causation and redressability are "closely related like two sides of a coin." *West v. Lynch*, 845 F.3d 1228, 1235 (D.C. Cir. 2017). A "causal connection" exists where the injury is "fairly traceable to the challenged action of the defendant," and an injury is "redressable" where the relief requested from the defendant is likely to remedy the injury suffered. *Lujan*, 504 U.S. at 560–61.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As with a 12(b)(1) motion, the Court "must accept as true all of the allegations contained in a complaint," but need not do the same for legal conclusions. *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).

4

At bottom, the complaint must contain allegations sufficient to permit a "reasonable inference that the defendant is liable for the misconduct alleged." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (quoting *Iqbal*, 556 U.S. at 678).

## III. ANALYSIS

### A. Burke Has Standing to Challenge the Permit Scheme

The Parties do not dispute that Plaintiff has standing for his claim that WMATA unlawfully arrested him for panhandling outside of the *McFarlin* zone. *See* ECF 25 at 7. The Court agrees that Plaintiff was injured by his arrests at (and exclusion from) the Metro stations, that these injuries are "fairly traceable" to WMATA's enforcement of Section 22-2302(b) outside of the *McFarlin* zone, and that they may be redressed by, among other things, enjoining WMATA from enforcing the statute outside of the *McFarlin* zone moving forward.

The Parties' only standing dispute lies in Plaintiff's challenge to WMATA's permit scheme. Defendant claims that Plaintiff does not have standing because his injuries are neither "fairly traceable" to the permit scheme nor redressable by prohibiting enforcement of the permit scheme in light of the "independent operation of the [panhandling] statute." ECF 25 at 13–14. Plaintiff counters that his past arrests are fairly traceable to WMATA's permit policy because both the permit scheme and WMATA's enforcement of the panhandling statute "are interdependent causes [and] not mutually exclusive policies." ECF 27 at 20. But Plaintiff admits that he neither requested nor was denied a permit, ECF 23 ¶ 8, and that MTPD officers' stated basis for arresting Plaintiff was Section 22-2302(b), not the Use Regulations, *id.* ¶¶ 30, 80, 85. As such, the Court agrees with Defendant that these arrests are not traceable to WMATA's permit scheme.

In the alternative, Plaintiff argues that his fear of returning to panhandle at the Metro is an independent injury that is traceable to the permit scheme. ECF 27 at 19–20. Fear of future

5

punishment may be a cognizable "injury in fact," but the absence of any prior arrests under the permit scheme here renders Burke's challenge to the Use Regulations on this basis, in essence, a pre-enforcement challenge. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–61 (2014). The Court therefore must analyze Burke's standing argument under that framework.

To establish standing for a pre-enforcement challenge, Burke must demonstrate that he has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [law], and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159 (2014); *Green v. DOJ*, 54 F.4th 738, 744 (D.C. Cir. 2022). To meet his burden, Burke must "demonstrate a realistic danger of sustaining a direct injury as a result of the [law's] operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). In some contexts, "[e]vidence that the challenged law is rarely if ever enforced . . . may be enough to defeat an assertion that a credible threat exists." *Seegars v. Gonzalez*, 396 F.3d 1248, 1252 (D.C. Cir. 2005). Similarly, plaintiffs may fail to establish a credible threat of prosecution where they "do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Babbitt*, 442 U.S. at 298–99. For this reason, allegations that the government has already brought enforcement actions against others or has directly threatened the plaintiff with prosecution under the challenged statute bolster a finding that the threat of prosecution is credible. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010) ("The Government tells us that it has charged about 150 persons with violating § 2339B, and that several of those prosecutions involved the enforcement of the statutory terms at issue here."); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("The prosecution of petitioner's handbilling companion is ample demonstration that petitioner's concern with arrest has not been 'chimerical.'").

Nonetheless, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel*, 415 U.S. at 459. Particularly in the First Amendment context, where the harm of self-censorship "can be realized even without an actual prosecution," *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988), a law that "on its face proscribes" the speaker's intended conduct bolsters a finding that the fear of prosecution is not "imaginary or wholly speculative," *Babbitt*, 442 U.S. at 302. The clearer the law, the more reasonable it is to fear it. This principle holds true even when the government asserts that the law "has not yet been applied and may never be applied" to the plaintiff. *Id.* Indeed, courts often consider whether government defendants are actually willing to "disavow[] any intention of invoking the [law]"—a position that often speaks volumes about whether there is a genuine risk of prosecution. *Id.*; *see also Am. Booksellers Ass'n*, 484 U.S. at 393 (finding a "well-founded fear that the law will be enforced against [plaintiffs]" where "[t]he State has not suggested that the newly enacted law will not be enforced, and [there is] no reason to assume otherwise"); *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1196 (D.C. Cir. 1992) (finding no credible threat of prosecution in light of "the Justice Department's disclaimer [of enforcing the statute against plaintiffs' conduct] and plaintiffs' unwavering claim that the statutes in no [way] apply to their activities").

The Court finds that Plaintiff has standing for his pre-enforcement challenge. Panhandling, as discussed more below, is at least "arguably" constitutionally protected speech. *See infra* Section III.B.1. Yet it is beyond arguable that Burke's panhandling violates WMATA's Use Regulations. As a non-passenger, the Use Regulations require Burke to get a permit if he wishes to engage in any speech or performance activity at Metro stations, but Burke cannot obtain one. WMATA does not grant permits "for uses that are illegal," and it considers panhandling anywhere

7

at a Metro station to be illegal. Use Regulations § 3.1; ECF 25 at 8. Yet even if Burke could obtain a permit—setting aside the fact that he has never sought one and has expressed no intention to do so, ECF 23 ¶ 8—that would neither "provide him the complete relief he seeks" nor "moot[] his First Amendment claim." *Enten v. District of Columbia*, 675 F. Supp. 2d 42, 48 (D.D.C. 2009). Burke challenges the permit scheme in and of itself as an unlawful prior restraint that intimidates individuals like himself into self-censorship. ECF 23 ¶¶ 155–78. According to Burke, it is not only the denial of a permit, but also the mere requirement that he obtain a permit at all that presents constitutional concerns. At bottom, Burke's desired course of conduct unambiguously violates WMATA policy, the plain text of which exposes him to a credible risk of "arrest, fines, or imprisonment." Use Regulations §§ 3.2.12–13.

Contrary to Defendant's arguments, Plaintiff's fear of adverse consequences for violating WMATA's permit scheme is not "baseless speculation." ECF 29 at 7. To reiterate, the Court agrees with Defendant that, because Burke was arrested "for violation of the panhandling statute and not for failure to obtain a permit," he has not "establish[ed] a causal connection . . . between the permit scheme and his arrests." *Id.*; ECF 25 at 13. But Burke's fear of returning to panhandle at the Metro is a distinct cognizable injury that *is* fairly traceable to WMATA's Use Regulations. On their face, the Use Regulations at a minimum prohibit Burke from panhandling without a permit, which is part and parcel of his well-founded fear of being punished for panhandling at Metro stations. These regulations leave no discretion to WMATA as to whether or how they are enforced: when someone engages in unauthorized conduct, WMATA "*shall* so notify the violator," the activity "*shall* be stopped," the offender "*shall* immediately leave WMATA property," or else their conduct "*shall* constitute a trespass" and they "*shall* be subject to arrest, fines, or imprisonment." Use Regulations §§ 3.2.12–13. Defendant does not contest that the Use Regulations prohibit Burke's conduct, nor

does Defendant suggest that the Use Regulations would allow Burke's conduct if WMATA were wrong about the applicability of the panhandling statute.

Yet Defendant further protests that Burke cannot rely on the mere possibility "that if the panhandling statute were deemed inapplicable . . . then WMATA would apply its permit requirements," characterizing this as a "purely hypothetical scenario." ECF 29 at 7. In effect, Defendant argues that, in light of WMATA's interpretation of the panhandling statute, WMATA has no need to apply the permit requirements—at least not yet. *See* ECF 25-1 ¶ 9 ("WMATA does not issue permits for panhandling because it does not allow panhandling at Metro stations in accordance with D.C. Code § 22-2302(b)."); Use Regulations §§ 3.2.12–13 (prohibiting unauthorized activity "in accordance with local criminal laws and ordinances"). But WMATA's choice to rely on one enforcement tactic while saving an alternative strategy up its sleeve for later does not render the permit requirements any less clear or Burke's fear any less credible.

Defendant is perhaps in the best position to offer a different interpretation of the Use Regulations or to disclaim prosecutorial intent under the same, but WMATA has done nothing of the sort. As a result, Defendant fails to rebut Plaintiff's straightforward assertion that his fear of being punished for panhandling relates to both the "enforcement of the panhandling statute" *and* "the permit requirement." ECF 27 at 23; *see Babbitt*, 442 U.S. at 302. After all, if Burke were to succeed on one challenge and not the other, that would surely constitute "a hollow victory." *Cf. Reyes v. Sessions*, 342 F. Supp. 3d 141, 146 (D.D.C. 2018) (holding that convicted felon had standing to challenge two statutory provisions prohibiting firearm *possession by* and firearm *transfer to* felons, as it was "common sense" that the two laws "together prevent him from acquiring a firearm"). Defendant's nesting doll objection to standing, without more, does not demonstrate that Burke's fear is too conjectural or speculative. As is often the case in challenges

9

to, for example, newly enacted laws that arguably restrict free speech, the Court "[is] not troubled by the pre-enforcement nature of this suit." *Am. Booksellers Ass'n*, 484 U.S. at 393.

The Use Regulations are unambiguous, Burke intends to engage in conduct prohibited by the regulations (as he has done before), and the only thing stopping WMATA from enforcing those regulations is—according to WMATA itself—its own enforcement of a different statute, which Burke is *also* challenging. Far from baseless, Burke's fear of punishment under the permit scheme is well founded. Discovery may reveal additional facts pertinent to this jurisdictional inquiry that compel a different result. At this early stage, however, Plaintiff has established standing for his pre-enforcement challenge to WMATA's Use Regulations.

### B. Burke Has Stated a Plausible Claim Under the First Amendment

Defendant raises two arguments as to why Plaintiff has failed to state a claim on which relief can be granted in his challenge to WMATA's enforcement of the D.C. panhandling statute. First, Defendant claims that panhandling is conduct, not protected speech under the First Amendment. ECF 25 at 15. Second, Defendant claims that the D.C. Court of Appeals' decision in *McFarlin v. District of Columbia* does not foreclose WMATA's enforcement of Section 22-2302(b) outside of the fifteen-foot zone surrounding the Metro escalator entrance. *Id.* at 16. The Court finds neither argument persuasive.

#### *1. Panhandling is Protected Speech*

"Speech" under the First Amendment exists where words or conduct "possess[] sufficient communicative elements" and the speaker intends to "convey a particularized message" that is likely to be understood by others. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Amongst the many subcategories of speech, "charitable solicitations" have long received constitutional protection as expressive conduct "intertwined with informative and perhaps persuasive speech seeking support

for particular causes." *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980); *see also Riley v. Nat'l Fed'n of the Blind, Inc.*, 487 U.S. 781, 789 (1988). According to at least seven federal circuits, panhandling fits these definitions and thus warrants constitutional protection. *See, e.g.*, *Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993); *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 553 (4th Cir. 2013); *Speet v. Schuette*, 726 F.3d 867, 878 (6th Cir. 2013); *Gresham v. Peterson*, 225 F.3d 899, 904–05 (7th Cir. 2000); *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019); *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1066 (10th Cir. 2020); *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999). While neither the D.C. Circuit nor the Supreme Court have addressed the issue, this Court agrees with the holdings of these sister circuits.

Panhandling is speech. It is defined by the use of words or conduct intended to persuade others to help fulfill a "need for food, shelter, clothing, medical care, or transportation." *See, e.g.*, *Loper*, 999 F.2d at 704. It communicates a specific, particularized message about the panhandler's need for support. *See id.* It also tends to convey social and political messages, often raising issues of "veteran status, homelessness, unemployment, and disability." *Gresham*, 225 F.3d at 904. True enough, the phrase "charitable solicitations" may evoke the idea of advocacy on behalf of an organized group, while "panhandling" suggests advocacy for oneself, but this difference strikes the Court as immaterial. *See Speet*, 726 F.3d at 877. The Court fails to understand why the First Amendment would shield charitable solicitations only if the charitable cause is external, rather than personal, to the speaker. If that were the case, an identical request for donations to "help the homeless" would be constitutionally protected when uttered by a volunteer working for the National Coalition for the Homeless, but unprotected when uttered by a homeless man himself. That cannot be correct.

Contrary to Defendant's suggestions, the Supreme Court's opinion in *City of Austin v. Reagan National Advertising of Austin, LLC* does not stand for the proposition that panhandling, or even pure solicitation itself, is unprotected speech. *See* ECF 32 at 1 (citing 596 U.S. 61 (2022)). In *Reagan*, the Court held that the City of Austin's off-premises sign regulation was content-neutral and not subject to strict scrutiny because its application depended on a sign's location, not its message. 596 U.S. at 71. The Court relied on precedent indicating that "restrictions on solicitation are not content based and do not inherently present 'the potential for becoming a means of suppressing a particular point of view,' so long as they do not discriminate based on topic, subject matter, or viewpoint." *Id.* at 72. Justice Breyer concurred, suggesting that many regulatory laws—including those for panhandling—may be "entirely reasonable" because they do not disproportionately harm First Amendment interests "in light of the relevant regulatory objectives." *See id.* at 79–81.

Defendant argues that "[t]he opinion of the Court and Justice Breyer's concurrence further refute Plaintiff's contention that [WMATA's] enforcement of the District of Columbia panhandling statute constitutes a content-based restriction of speech subject to strict scrutiny," ECF 32 at 1–2, but this argument is both incorrect and misses the point. For starters, nothing in the majority opinion defeats the notion that panhandling is speech deserving of at least *some* constitutional protection. Quite the opposite. The majority opinion held that the City of Austin's billboard regulation was still subject to intermediate scrutiny. *Reagan*, 596 U.S. at 76. The concurrence echoed that sentiment, suggesting that various regulatory laws (including those for "panhandling") might not automatically be subject to strict scrutiny but should still be subject to some "weigh[ing] [of] . . . harms and interests." *Id.* at 83. At bottom, neither opinion indicates that panhandling deserves no protection and therefore may be subject to whatever restrictions the

government desires. Defendant's submissions do not persuade the Court that it should hold, contrary to the wisdom of seven other circuits, that panhandling "is not protected speech." ECF 25 at 15.

At the motion to dismiss stage, the Court need not and does not decide whether restrictions on panhandling are reviewed with strict, intermediate, or some other degree of scrutiny. It is sufficient that panhandling is speech protected by the First Amendment at some level. Moreover, Plaintiff does not even ask this Court to invalidate Section 22-2302(b) as an unconstitutional ban on panhandling; he claims only that WMATA was acting *outside* the scope of the statute and therefore unlawfully. ECF 23 ¶¶ 141–42. With that in mind, the Court next turns to Defendant's statutory arguments as to why Plaintiff's claim must fail.

### 2. McFarlin *Precludes Enforcement of Section 22-2302(b) Outside of the Fifteen-Foot Escalator Radius.*

Defendant argues that, even though the D.C. Court of Appeals' decision in *McFarlin* held that Section 22-2302(b) is constitutional when applied within the fifteen-foot zone around escalator entrances, *McFarlin* did not address the statute's "full scope" or whether it "might also constitutionally cover other scenarios like the one presented in this case." ECF 25 at 17. In other words, Defendant views *McFarlin* as strictly limited to the specific facts of the case and not a case that announced a generally applicable rule. Plaintiff reads the case differently, arguing that the D.C. Court of Appeals addressed the statutory issue head on, holding that "D.C. Code § 22-2302(b) simply does not apply outside the *McFarlin* zones" and thus MTPD was "not acting pursuant to a statute authorizing their conduct" when its officers arrested him. ECF 27 at 17. The Court concludes that Plaintiff has the better reading of the case.

In *McFarlin*, the District of Columbia Court of Appeals defined the term "subway station or stop" in Section 22-2302(b). 681 A.2d at 448. The court was charged with determining whether

13

a panhandler, who had solicited money from Metro riders while standing (at most) six feet away from the top of a Metro station's escalator, could be prosecuted under Section 22-2302(b) in a manner consistent with the U.S. Constitution. *See id.* at 449–50. The court first delineated the scope of the panhandling statute. After examining the statute's text, legislative history, and relation to WMATA's Use Regulations, the court concluded that "subway station or stop" in Section 22-2302(b) covers only the areas "within fifteen feet of the top of a subway escalator." *Id.* at 447–49. The court next addressed whether applying a ban on panhandling within that fifteen-foot zone was compatible with the First Amendment and answered in the affirmative. *Id.* (acknowledging the "significant governmental interest [of] ensuring an orderly flow of pedestrian traffic on and off the escalator"). Thus, because the panhandler in *McFarlin* was within that zone, the statute applied to him, and the Constitution did not preclude his prosecution. *Id.* at 450.

  Defendant is correct that the D.C. Court of Appeals used some "limiting language" when describing the scope of the statute, but this language is not as "limiting" as Defendant suggests. ECF 25 at 19. The holding in *McFarlin* is plain as day: "we therefore construe [Section 22-2302(b)], insofar as relevant here, as prohibiting all panhandling (whether 'aggressive' or nonaggressive) within fifteen feet of the escalator entrance." 681 A.2d at 448. WMATA hangs its hat on the phrase "insofar as relevant here." ECF 25 at 19. But any ambiguity that may flow from those four words is all but eliminated by the court's later statement that the statute was "designed to ensure public safety by prohibiting conduct that may be reasonably expected to disrupt or impede the smooth flow of pedestrian subway traffic *within fifteen feet of a subway escalator*." *Id.* at 449 (emphasis added). And if that were not enough, the court further observed that "had [the panhandler] moved several feet into space away from the top of the escalator and engaged in peaceful begging . . . his activity *would have been lawful*." *Id.* (emphasis added). This language

14

leaves no doubt as to how the highest court in D.C. construed this D.C. statute. As such, the Court finds that Plaintiff has stated a claim for which relief can be granted by alleging that WMATA acted beyond its lawful authority by punishing his panhandling outside of the fifteen-foot radius surrounding the Metro escalator entrance and exit.

## IV.    CONCLUSION

Plaintiff's allegations, taken as true, establish that the Court has subject matter jurisdiction over his case and that he has stated a claim for which relief can be granted. Of course, discovery may reveal additional facts pertinent to the merits or jurisdiction (particularly with regard to Plaintiff's pre-enforcement challenge to the permit scheme) that push in the opposite direction. However, Defendant has not demonstrated that Plaintiff's claims must be dismissed at this stage of litigation. The motion to dismiss is therefore **DENIED.** A separate order accompanies this memorandum opinion.

**SO ORDERED.**

                                                  JIA M. COBB
                                                  United States District Judge

Date: July 18, 2024